BROTHERS OF HOLY CROSS,
INC., Petitioner,

v.

ST. JOSEPH COUNTY PROPERTY
TAX ASSESSMENT BOARD OF
APPEALS, Respondent.

No. 49T10–0507–TA–59.

Tax Court of Indiana.

Dec. 19, 2007.

Brent A. Auberry, Stephen H. Paul, Baker & Daniels LLP, Indianapolis, IN, Richard A. Nussbaum, II, Sopko, Nussbaum & Inabnit, South Bend, IN, Attorneys for Petitioner.

Steve Carter, Attorney General of Indiana, Andrew W. Swain, Chief Counsel, Tax Section, John D. Snethen, Deputy Attorney General, Indianapolis, IN, Attorneys for Respondent.

FISHER, J.

The Petitioner, Brothers of Holy Cross, Inc. (BHC), appeals the Indiana Board of Tax Review's (Indiana Board) final determination denying its application for an exemption on its real property for the 2002 tax year (year at issue). The issue for this Court to decide is whether the Indiana Board erred in determining that BHC's real property did not qualify for a property tax exemption.

## FACTS AND PROCEDURAL HISTORY

BHC, an Indiana not-for-profit corporation affiliated with the Roman Catholic Church, owns a 38.62 acre parcel of land in Notre Dame, Indiana. The parcel contains BHC's retirement community, the Holy Cross Village (the Village), and BHC's administrative headquarters.[1] The Village is comprised of single-family residences, duplexes, and a four-unit residence. The Village offers its residents the amenities found in traditional apartment living as well as unique and special services.[2] A resident may purchase a revocable right of occupancy for life within the Village by paying a refundable "entrance fee" which, in 2002, ranged from $129,900 to $239,900.[3] Residents·are also required to pay a monthly maintenance fee.[4]

On May 15, 2002, BHC filed an application with the St. Joseph County Property Tax Assessment Board of Appeals (PTABOA) seeking a charitable purposes exemption on the real and personal property within its parcel for the 2002 tax year. While the PTABOA granted a 100% exemption on BHC's personal property, it only allowed a 17% exemption on BHC's real property. More specifically, the PTABOA determined that only BHC's administrative center and its underlying land were exempt from taxation. BHC subsequently appealed to the Indiana Board. On June 7, 2005, after conducting a hearing, the Indiana Board issued a final determination affirming the PTABOA.

---

1. BHC also owns a nursing home (the Dujarie House), an assisted living facility (Schubert Villa), an apartment building (the Riverside Place), and a chapel (the St. Joseph Chapel). These facilities are not, however, located within the Village nor are they a part of this appeal.

2. For instance, each residence is equipped with safety features (such as bathroom grab bars and skid resistant floors) and is wheelchair accessible.

3. The entrance fee, which may be refunded at an amortized annual rate of 4%, is based upon a residence's square footage and its construction costs. (See Cert. Admin. R. at 743.)

4. The maintenance fee, based upon a residence's square footage, covers the utilities, interior and exterior maintenance, and landscaping (including snow removal). In 2005, the monthly maintenance fee ranged between $415 and $660. (See Cert. Admin. R. at 740.)

On July 20, 2005, BHC filed this original tax appeal. The Court heard the parties' oral arguments on November 30, 2006. Additional facts will be supplied as necessary.

## STANDARD OF REVIEW

This Court gives great deference to final determinations of the Indiana Board when it acts within the scope of its authority. *Wittenberg Lutheran Vill. Endowment Corp. v. Lake County Prop. Tax Assessment Bd. of Appeals*, 782 N.E.2d 483, 486 (Ind. Tax Ct.2003), *review denied.* Consequently, the Court will reverse a final determination of the Indiana Board only if it is:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) contrary to constitutional right, power, privilege, or immunity;

(3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory jurisdiction, authority, or limitations;

(4) without observance of procedure required by law; or

(5) unsupported by substantial or reliable evidence.

*See* IND.CODE ANN. § 33–26–6–6(e)(1)–(5) (West 2007).

## DISCUSSION

In Indiana, all tangible property is subject to taxation. *See* IND.CODE ANN. § 6–1.1–2–1 (West 2007). Nevertheless, the Indiana Constitution provides that the legislature may exempt certain categories of property from taxation. *See* IND. CONST. art X, § 1. Pursuant to this grant of authority, the legislature enacted Indiana Code § 6–1.1–10–16, which provides that "[a]ll or part of a building is exempt from property taxation if it is owned, occupied, and used [ ] for … charitable purposes." IND.CODE ANN. § 6–1.1–10–16(a) (West 2002). This exemption also generally extends to the land on which the building is situated, as well as the personal property that is contained therein. *See* A.I.C. § 6–1.1–10–16(c), (e).

The taxpayer bears the burden of proving that it is entitled to the exemption it seeks. *See College Corner, L.P. v. Dep't of Local Gov't Fin.*, 840 N.E.2d 905, 908 (Ind. Tax Ct.2006). In order to meet that burden, the taxpayer must have submitted probative evidence, during the administrative hearing, sufficient to establish that its property qualifies for a tax exemption.[5] *See id.* at 907–08 (footnote added). Accordingly, a taxpayer who seeks a charitable purposes exemption pursuant to Indiana Code § 6–1.1–10–16(a) must demonstrate that its property was owned, occupied, and predominately used for a charitable purpose during the relevant tax year (*i.e.*, "the year that ends on the assessment date of the property"). *See State Bd. of Tax Comm'rs v. New Castle Lodge # 147, Loyal Order of Moose, Inc.*, 765 N.E.2d 1257, 1263 (Ind.2002); *Indianapolis Osteopathic Hosp., Inc. v. Dep't of Local Gov't Fin.*, 818 N.E.2d 1009, 1014 (Ind. Tax Ct.2004), *review denied. See also* Ind. Code Ann. §§ 6–1.1–10–36.3; 6–1.1–11–3(c)(5) (West 2002).

On appeal, BHC argues that the Indiana Board's final determination denying it the exemption for 2002 is erroneous because the Village was clearly owned, occupied, and used for the charitable purpose of "provid[ing] for the care and com-

---

**5.** "Probative evidence is evidence that tends to prove or disprove a point in issue." *Inland Steel Co. v. State Bd. of Tax Comm'rs*, 739 N.E.2d 201, 211 (Ind. Tax Ct.2000) (internal quotation and citation omitted), *review denied.*

fort of the aged[.]" (Pet'r Br. at 11.) In turn, BHC maintains that during the administrative hearing, it submitted probative evidence establishing that the Village was used "to provide senior citizens [with] a continuum of care while permitting [them] to live [ ] active, independent lifestyle[s] in a safe community with maintenance-free homes and access to facilities and programs [that] address[ed] their social, educational, religious, and healthcare needs." (Pet'r Br. at 11–12; Oral Argument Tr. at 4.) More specifically, to support its claim that it predominately used the Village for a charitable purpose during the year at issue, BHC primarily relied on copies of the Village's 2003–2005 monthly newsletters and activity calendars, summaries of the services and activities offered to the Village's residents, and lists of residents that had utilized some of those services and activities. (*See* Cert. Admin. R. at 202–317.) As will be explained, however, this evidence does not demonstrate that the Village was predominately used for a charitable purpose from March 1, 2001 to March 1, 2002.

For example, on appeal BHC seeks to exempt 23 single-family residences, six duplexes, one four-unit residence, and the land underlying those improvements from property taxation. (*See* Cert. Admin. R. at 134, 738–39; Pet'r Br. at 3.) Nevertheless, the PTABOA's final determination indicates that only 17 single-family residences and three duplexes were completed as of the March 1, 2002 assessment date. (*See* Cert. Admin. R. at 133.) Consequently, there is significant ambiguity as to which residences were on the parcel as of the March 1, 2002 assessment date. *See* IND.CODE ANN. § 6-1.1-11-1 (West 2002) (providing that exemptions are privileges subject to waiver when property owners do not "comply with the statutory procedures

for obtaining [ ] exemptions"); IND.CODE ANN. § 6-1.1-11-3(a), (c)(1), (5) (West 2002) (requiring property owners to file exemption applications with "[a] description of the property claimed to be exempt in sufficient detail to afford identification .... [f]or the year that ends on the assessment date ") (emphasis added).

BHC also claims that during the year at issue, the Village was used for a charitable purpose because it "addressed" some of its residents' healthcare needs by providing them with access to Holy Cross College's health clinic and because it was a "part of [the overall provision of] facilities providing a 'continuum of care' " for its residents. (*See* Pet'r Br. at 6, 9; Cert. Admin. R. at 780, 784.) In fact, BHC explains that 11 residents had transitioned from the Village to Schubert Villa or the Dujarie House between 2001 and 2005. (*See* Pet'r Br. at 9; Cert. Admin. R. at 211, 784–85.) BHC's newsletters, however, indicate that residents did not have access to the health clinic until October 2003. (*See* Cert. Admin. R. at 285, 288, 306, 315.) Furthermore, other newsletters indicate that the Village was not a part of BHC's continuum of care efforts during the year at issue. (*See* Cert. Admin. R. at 260 (BHC's March *2004* newsletter stating that "[t]he feasibility study on the *possibility of becoming* a [continuing care retirement community (CCRC)] is nearing completion") (emphases added).) (*See also* Cert. Admin. R. at 239, 250–51, 255 (detailing the progression of the Village's CCRC efforts).) Additionally, the Village's Residency Agreement makes no mention of a resident's opportunity to transition to Schubert Villa or the Dujarie House. (*See* Cert. Admin. R. at 385–91.)

Finally, BHC claims that during the year at issue, the Village was used for a

charitable purpose because a number of other activities and services were provided for its residents that "addressed" their educational and social needs. For example, BHC explains that the Village provided, *inter alia,* the following activities and services to its residents:

(1) monthly luncheons at the University of Notre Dame's University Club;

(2) elected participation in the "Residents Advisory Council" (providing communication between the residents and the Village's administrators);

(3) course enrollment and teaching opportunities through Holy Cross College's community education program;

(4) access to regularly scheduled transportation to St. Mary's College, Holy Cross College, and Notre Dame via Notre Dame's shuttle bus; and

(5) access to information and events through the Village's monthly newsletters and calendars.

(*See* Pet'r Br. at 5–8; Cert. Admin. R. at 202–06, 212, 776–80, 785–86, 790–91.) Once again, however, BHC's own evidence either directly refutes, or casts significant doubt on the provision of each of those activities and services during the year at issue.

More specifically, BHC's newsletters clearly indicate that the monthly luncheons did not commence until August 2003. (*See* Cert. Admin. R. at 290, 292, 295, 297 (explaining the planning and results of the first luncheon).) Other newsletters indicate that the Residents Advisory Council was not formed until November 2003. (*See* Cert. Admin. R. at 281, 287, 290, 306 (explaining the Residents Advisory Council's election and formation process).)

BHC's evidence with respect to the educational activities not only fails to specify when the residents either took courses or taught classes at Holy Cross College, but it also includes the names of individuals who either did not reside in the Village or who did not reside in the Village during the year at issue. (*Cf.* Cert. Admin. R. 207–10 (a list of individuals who lived inside and outside of the Village) *with* Cert. Admin. R. 212 (the list of individuals who participated in the educational activities).) The availability of shuttle service during the year at issue is also questionable as neither BHC's newsletters nor its calendars make any mention of the service until October 2004. *Cf.* Cert. Admin. R. 233, 238 (the October 2004 newsletter and calendar) *with* Cert. Admin. R. at 239–317 (the February 2003 through September 2004 newsletters and calendars.) Finally, the Village did not publish a newsletter until February 2003. (*See* Cert. Admin. R. at 315 (stating "[y]ou have in your hands the very first of what we hope will be a growing number of editions of *The Village News,* the official communiqué for residents of [the Village]").)

While BHC's evidence clearly explains what services and activities were available to the Village's residents in 2003–2005, the evidence lacks probative value with respect to the year at issue because it fails to establish what services and activities were available to the Village's residents at that time. *See Plainfield Elks Lodge No. 2186 v. State Bd. of Tax Comm'rs,* 733 N.E.2d 32, 34 n. 3 (Ind. Tax Ct.2000) (evidence of notations in a diary detailing use of subject property during the year at issue supported claim that the property was used for charitable purposes), *review denied. But see Fleet Supply, Inc. v. State Bd. of Tax Comm'rs,* 747 N.E.2d 645, 650 (Ind. Tax Ct.2001) (evidence of a building's 2002

assessed value was not probative as to its assessed value three years later), *review denied.* Therefore, BHC has not established that the Village was owned, occupied, and used for a charitable purpose during the year at issue.[6],[7]

## CONCLUSION

For the above stated reasons, the Indiana Board's final determination is AFFIRMED.[8]

---

6. Alternatively, BHC argued that at the very least, its land was exempt from taxation pursuant to Indiana Code § 6–1.1–10–16(c)(1). Indiana Code § 6–1.1–10–16(c)(1) provides that "[a] tract of land ... is exempt from property taxation if[ ] a building that is exempt under subsection (a) ... is situated on it[.]" IND.CODE ANN. § 6–1.1–10–16(c)(1) (West 2002). BHC asserts that its land met the statutory requirements for the exemption because (1) the land was part of an entire "tract" as it was "under common ownership and [was] contained within a continuous border[,]" and (2) a building exempted under Indiana Code § 6–1.1–10–16(a), the administrative center, was located on the tract. (*See* Pet'r Br. at 37–40.) BHC, however, is incorrect.

As previously explained, a taxpayer must demonstrate that its property is *predominately* used for an exempt purpose before that property will qualify for a property tax exemption. *See* IND.CODE ANN. § 6–1.1–10–36 (West 2002). BHC has offered no evidence to demonstrate that all of its land was *predominately* used for an exempt purpose. Consequently, BHC's argument fails.

7. BHC also argued that the Indiana Board erroneously relied upon the irrelevant evidence of the residents' net worth in denying the exemption. (*See* Pet'r Br. at 30–36.) While the Court agrees that the evidence was irrelevant, any error committed by the Indiana Board was harmless, as exclusion of that evidence would not alter the outcome of this matter. *See* Ind. Trial Rule 61.

8. Finally, because BHC's evidence was not probative the Court need not and does not address whether the services and activities offered at the Village constituted a charitable purpose.